Filed 7/20/15  P. v. Smith CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES LEE SMITH,<br><br>    Defendant and Appellant. | E060611<br><br>(Super.Ct.No. RIF1105233)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Irma Poole Asberry, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Charles Lee Smith guilty of willfully causing or permitting an elder or dependent adult to suffer unjustifiable physical pain or mental suffering under circumstances likely to produce great bodily harm or death. (Pen. Code, § 368, subd. (b)(1).)[1] The jury found true the allegations that (1) defendant personally inflicted great bodily injury upon a person who was 70 years of age or older (§§ 12022.7, subd. (c), 1192.7, subd. (c)(8)); and (2) defendant battered a person, who was 60 years of age or older, resulting in a physical injury that required professional medical treatment (§ 1203.09, subd. (f)). Defendant admitted suffering a prior conviction that was both a strike (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)) and a serious felony (§ 667, subd. (a)). The trial court sentenced defendant to prison for a term of 18 years.

Defendant raises six issues on appeal. First, defendant contends his due process rights were violated by the admission of evidence relating to his prior conviction for elder abuse. Second, defendant contends the trial court erred by allowing out-of-court statements by the victim to be admitted as excited utterances. Third, defendant asserts the trial court erred by admitting the victim's prior inconsistent statements. Fourth, defendant contends the prosecutor committed misconduct. Fifth, defendant asserts the trial court erred by (a) not striking his prior strike; and (b) imposing the upper sentencing term. Sixth, defendant contends reversal is required due to the cumulative effect of the foregoing alleged errors. We affirm the judgment.

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROSECUTION'S CASE

The victim was the mother of five children—four sons and one daughter.  The victim's sons were Edward, Stanford, Tom, and defendant.  The victim lived in Menifee.  In October 2011, the victim was 78 years old.  Defendant was the victim's primary caregiver.

Lanette Moynihan was the victim's neighbor.  In October 2011, Moynihan had known the victim for approximately seven years, and Moynihan regularly visited the victim.  Moynihan helped the victim shop and checked-in on her.  On Friday, October 28, 2011, at approximately 9:30 a.m., the victim telephoned Moynihan and asked Moynihan to come to the victim's house.  The victim sounded shaky and upset.

Moynihan went directly to the victim's house.  The victim answered the door.  Moynihan saw the victim had bruising on the side of her face and neck, and she was not speaking in her usual manner—it appeared the victim was not wearing her dentures.  The victim said defendant struck her on Sunday or Monday, and that she was "in a lot of pain."  The victim said that she was sitting at the dining room table when defendant punched her; she fell to the floor when defendant struck her.  Defendant then placed the victim on the couch and took care of her.  The victim said she had only eaten soup since being struck.

The victim explained that defendant had left for Texas to pick-up a vehicle he had purchased.  Moynihan and the victim called one of the victim's other sons, Tom.  Tom called his brother, Ed, who in turn called Moynihan.  Ed told Moynihan to take the

3

victim to the emergency room. Moynihan stayed with the victim at the hospital for hours until Ed arrived.

When the victim arrived at the hospital, she told a triage nurse, Lorraine Pratt, that she had been assaulted on Sunday, had been unable to eat for three days, and indicated her pain was "as bad as it can be." Pratt observed the victim had black-yellowish bruising around her throat and was unable to open her mouth.

An emergency room nurse, Joo Min, saw the victim on October 28 at approximately 11:30 a.m. The victim told Min that her son had struck her "a couple days" prior. When asked where, the victim pointed to her neck and upper sternum. Min observed purple bruising on the victim's neck, and yellow bruising on the victim's sternum.

Dr. Zeke Foster treated the victim in the emergency room for a total of approximately 20 minutes. The victim appeared "alert, oriented, and was able to tell [Foster] what had happened," although she was crying. The victim said she had been struck by her son five days prior. The victim's jaw was swollen; she had bruising on her neck, chin, and sternum; and she was slightly dehydrated. Foster found the victim's jaw and sinuses were fractured.

Foster examined the victim, but did not see any injuries on her arms, legs, abdomen, or back. Foster explained that, when an elderly person falls, there are typically injuries to the person's limbs, as the person tries to brace herself. Foster opined that the victim's injuries were consistent with being struck because (1) there was

no laceration around her facial injuries, which typically occurs with a fall; and (2) the victim's nasal bones were not injured, which one would expect if the victim fell.

While at the hospital, the victim spoke with Felicia Profit, a medical social worker, for approximately 10 minutes. The victim told Profit that she was at the hospital because defendant struck her so forcefully that she fell to ground due to the impact. The victim told Profit that defendant struck her three days prior. The victim explained defendant had stayed in the house with her following the assault, but he left the house that day, October 28, to repair a car in Texas. The victim answered Profit's questions in an appropriate and timely manner. It did not appear to Profit that the victim had any memory problems.

Riverside County Sheriff's Deputy Spainhoward spoke to the victim at the hospital at approximately 12:15 p.m. The victim was "alert and oriented and answered questions appropriately, timely, and consistently." The victim told Spainhoward that she was in pain because defendant had punched her three or four days prior. The victim said she was sitting at the dining room table, talking with defendant, when defendant became upset and punched her in the face. The victim recalled falling to the ground from the impact of the punch. Defendant then picked up the victim and placed her back in her chair. The victim asked to be in a more comfortable place, so defendant moved her to the couch. Defendant also gave the victim pain medication and ice. The victim said defendant left for Texas to purchase a car the day after he punched her.

Spainhoward informed the victim that charges would be filed against defendant. The victim said she did not want charges to be filed. Moynihan, who remained with the

5

victim while the victim spoke with Spainhoward, noticed a change in the victim's demeanor when Spainhoward discussed charges being filed. The victim became upset, cried, and said, "it didn't happen."

Moynihan visited the victim on a daily basis after October 28, helping her with laundry and medications. Moynihan stopped visiting the victim in January 2012 when she went to the victim's house and defendant answered the door—Moynihan had not seen defendant since October and she was uncomfortable visiting the victim's house while defendant was caring for the victim. Moynihan did not notice any issues with the victim's memory; the victim answered questions appropriately and in a timely manner.

Emaline Dhaliwal, a social worker with Riverside County Adult Protective Services, met with the victim at the victim's house on the evening of October 28. Dhaliwal felt the victim was being evasive when the victim said "she couldn't remember much." The victim told Dhaliwal that she and defendant argued, and defendant struck her, but did not elaborate further. The victim was speaking appropriately and coherently when answering Dhaliwal's questions. Dhaliwal opined that the victim did not have memory deficits because the victim recalled details that people with deficits are unable to recall, such as the type of plants in her yard and the names of her children and grandchildren.

The victim testified at defendant's trial. The prosecutor asked the victim if the victim understood why she (the victim) was there. The victim responded, "I am here to prove that [defendant] has done nothing wrong." The victim explained that defendant helped her with shopping, cooking, cleaning, and medical appointments. When asked if

6

she recalled her jaw hurting, the victim responded, "I have no idea when my jaw was injured. I saw nothing. I felt nothing. There's nothing there. I got up and I fainted, and they took me to the hospital. That's all I know about it." The victim said she fell outside her house, while she was alone. When she awoke, she was in a field, and then she was taken to the hospital. Bobbie Garza, an investigator for the Riverside County District Attorney's Office, explained that it is common for victims of elder abuse to recant or change their stories.

### B. UNCHARGED PRIOR OFFENSE

The parties entered into the following stipulation regarding defendant's prior offense: "[O]n November 25, 2000, Santa Ana Police Officer Robert Rubalcava spoke to [the] then 67-year-old [victim] in Santa Ana, California. [The victim] reported to him that morning her son, [defendant], came to house to invite her to breakfast at his home. She went there and they argued. [Defendant] struck her on her head with the palm of his right hand hitting her on the left area of her forehead. [Defendant] calmed down and she left and returned home. She did not call the police because she thought they could talk it out and she was scared of him. Later that same day, [defendant] returned to her home. He pushed her into a chair and he sat in another chair. [Defendant] hit her on the right side of her head with his left first [*sic*]. She did not know if it was open or closed. The blow knocked off her glasses and was just about enough to knock her off her chair.

"[Defendant] was convicted of Penal Code section 368[, subdivision] (b)(1), elder abuse likely to cause great bodily harm or death, on September 25, 2011 in Orange

7

County for this incident which occurred on November 25, 2000 and involved his elderly mother[, the victim]."

C. DEFENSE'S CASE

Dr. Dale Stringer was an oral maxillofacial surgeon. The victim was Stringer's patient in November 2011. He treated her fractured jaw. Stringer could not decipher if the victim's injuries were caused by a fall or a strike from another person.

Dr. Susan Danek had been the victim's primary care physician for approximately eight years. Danek said that in September 2010, the victim fell out of bed and suffered a head laceration. Danek also explained the victim was taking Namenda, a medication for dementia. Danek opined that the victim had been showing signs of dementia for "within the last few years," possibly since 2010, and that the victim had been diagnosed with dementia.

Daniella Patterson-Macho was a physician's assistant at the Neural Center in Murrieta. Patterson-Macho evaluated the victim, in January 2012, to determine if she suffered dementia. Patterson-Macho diagnosed the victim as suffering moderate to severe dementia and altered mental status, which referred to inappropriate behavior in certain situations.

In April 2011, before the assault at issue in this case, Leeanna Massignani was a social worker with the Riverside County Office On Aging. Massignani spoke with the victim on April 19, 2011, after defendant sought assistance for the victim. Defendant or the victim told Massignani that the victim had a history of falling more than four times a

year.  Additionally, based upon her assessment, Massignani concluded the victim had severe memory problems.

Alma Atendido was one of the victim's neighbors.  In early October 2011, Atendido went to the victim's house.  The victim was panicked because she believed she could hear people in her garage.  Atendido looked around the victim's garage, but no one was in the garage.  Atendido stayed with the victim for approximately one hour, trying to help her relax.  On another occasion in October 2011, the victim came to Atendido's house at 6:00 a.m.  The victim was telling Atendido "a lot of things that [did not] make sense."  Atendido calmed the victim, and the victim fell asleep on Atendido's couch.

The victim's younest son, Tom Smith, also testified at trial.  Tom[2] noticed the victim exhibited unusual behavior shortly after her October 2011 injury.  For example, the victim tried to convince Tom that someone was living in the attic, because she heard voices in the attic.  Tom looked in the attic; no one was in the attic.  On another occasion, Tom observed the victim talking when no one was present.  The victim said she was speaking to a person upstairs, but no one was upstairs.  The victim also placed a cup of milk in the toaster oven.  The victim explained she did so because she wanted hot chocolate.  Tom also said the victim forgot her children's and/or grandchildren's names.

Sioux Gregory-Smith was the victim's former daughter-in-law.  Sioux was married to Sanford, one of the victim's sons.  Sioux recalled the victim suffered a stroke

---

[2] For the sake of clarity, we use first names for defendant's relatives, because they share the same last name.  No disrespect is intended.

prior to 2010, and after the stroke, the victim's health began declining. The victim

became "wobbly" and needed a walker. Sioux recalled the victim falling out of bed and

hitting her head on a nightstand. The victim then went to get help, but fell down the

stairs. The victim also spoke to Sioux about people living upstairs, although the victim

lived alone.

D.    PROSECUTION'S REBUTTAL CASE

Dr. Steven Tam, a geriatrician at the University of California, Irvine, reviewed

the victim's medical records. Tam found the victim did not have a dementia diagnosis

in October 2011. Tam also found there was no mention of the victim suffering memory

impairment in October 2011. Tam concluded, based on the medical records, that there

was not sufficient information for the victim to be diagnosed as suffering dementia in

January 2012. Tam explained that a person suffering dementia typically would not be

able to tell a consistent story multiple times, e.g., to a neighbor, doctor, nurses, and law

enforcement officer.

DISCUSSION

A.    PRIOR UNCHARGED OFFENSE

1.    *PROCEDURAL HISTORY*

Prior to trial, the prosecution moved for the trial court to deem admissible

defendant's prior conviction for elder abuse (Pen. Code, § 368, subd. (b)(1)). (Evid

Code, § 1109.) The prosecutor noted the prior crime and charged offense involved the

same victim, the same conduct, and the prior crime occurred 10 years 11 months prior

to the charged offense. In regard to the conduct, the prior crime consisted of defendant

10

and the victim arguing; defendant grabbing the victim's hair and shaking her head; defendant striking the victim's head with the palm of his hand; defendant throwing a notebook at the victim; defendant grabbing the victim around her waist and pushing her into a chair; defendant telling the victim she would die that day; and defendant striking the victim's head with his fist, which knocked the victim's glasses off her face and nearly caused her to fall out of a chair.

The prosecutor asserted the charged and uncharged offenses were similar because in both instances defendant and the victim argued and defendant struck the victim's head while she was sitting. In regard to the almost 11-year gap between the two offenses, the prosecution asserted that while the crimes were separated by more than 10 years, the prior crime evidence should be admitted in the interest of justice due to the similarity between the two offenses.[3]

On August 23, 2013, the trial court held a hearing. The trial court explained that a "lengthy" chambers conference had been held the day prior, and that counsel had also met the morning of August 23 "and spent a great deal of time in conversation" wherein "all of the items were discussed." On the record, the court and parties discussed the motion to admit evidence of defendant's prior conviction.

The trial court explained that a prior crime that is over 10 years old usually is inadmissible unless its admission serves the interest of justice (Evid. Code, § 1109,

---

[3] Evidence Code section 1109, subdivision (e), provides, "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

11

subd. (e)).  The trial court explained, "Even though it is outside of the ten-year period, I do find in the interest of justice that this evidence would be evidence that would help the jury in determining the underlying facts before this case."  The trial court found the evidence of defendant's prior criminal threat toward the victim (Pen. Code, § 422) was not probative, but his prior elder abuse of the victim (Pen. Code, § 368, subd. (b)(1)) was probative.

Defendant's counsel argued that if the evidence of the prior conviction were to be admitted, then most of the details should be redacted because the details would cause the evidence to be more inflammatory.  The court explained that defendant's statements and defendant's grabbing the victim's hair and shaking her head were excluded; however, defendant striking the victim's head with his palm, pushing the victim into a chair, and striking the victim's head with his fist, causing her glasses to fall off, would be admitted.

Defendant's counsel then asserted the prior crime was more than 10 years old, so the probative value of the prior crime evidence was diminished.  Defense counsel asserted the prior crime evidence was prejudicial, and in light of the dimished probative value, the evidence should not be admitted because if the jurors heard defendant struck the victim 11 years prior, they would likely automatically convict him.  The prosecutor asserted the prior crime evidence was "extremely probative" because it involved the same victim and almost the same conduct.  The trial court took the matter under submission.

12

On August 26, the trial court explained that it found defendant's prior conviction to be admissible because its admission served the interest of justice. The court said, "The evidence is such that we do have sufficient similarity in the two events. The evidence is substantial as to similiarity; in fact, as I examined the code sections, we look at whether there—in this particular matter, since we have the same individuals involved, the actions that were performed by the defendant are sufficiently similar to the prior actions . . . ." The court explained that it limited the prejudice to defendant by excluding his other priors going back to 1989 and sanitizing the evidence related to the criminal threats and grabbing and shaking the victim. The court found the probative value of the evidence outweighed the prejudice, and thus ruled that the evidence was admissible.

During the course of the trial, the parties created a stipulation regarding the information that would be provided to the jury, although defense counsel continued to object to any information about the prior conviction being presented to the jury. The stipulated language is quoted *ante*.

2.      *ANALYSIS*

Defendant contends the trial court violated his right of due process and right to a fair trial by admitting evidence of his prior conviction (Evid. Code, § 1109). In particular, defendant takes issue with the 11-year age of the prior offense.

When a defendant is charged with elder abuse, evidence of the defendant's commission of other acts of elder abuse is admissible, unless (1) rendered inadmissible by Evidence Code section 352, or (2) the prior act occurred more than 10 years before

13

the charged offense. (Evid. Code, § 1109, subds. (a)(2) & (e).) There is an exception for prior acts that are more than 10 years old, which is the evidence may be admitted if doing so serves the interest of justice. (Evid. Code, § 1109, subd. (e).)

In *People v. Johnson*, the appellate court explained that the "interests of justice" analysis is similar to an Evidence Code section 352 analysis, although it calls for a higher degree of scrutiny wherein the probative value of the evidence must weigh more heavily than it does under an Evidence Code section 352 analysis. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539.)

"The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211.) We review the trial court's ruling under the abuse of discretion standard of review. (*People v. Johnson, supra,* 185 Cal.App.4th at p. 539.)

The charged offense and the prior crime both involve defendant arguing with the victim and then defendant striking the victim's head with his fist as the victim was sitting. The two crimes are nearly identical. Accordingly, the trial court could properly conclude there was a high degree of similarity between the two offenses. The almost 11-year gap between the charged and uncharged offenses detracts somewhat from the

14

probative value of the offense, due to the lapse of years; however, due to the nearly identical nature of the two incidents the trial court could reasonably conclude the prior offense evidence had strong probative value.

The prior offense evidence reflected defendant was convicted, therefore, the jury would likely feel less desire to punish defendant because he was already punished for the offense. Additionally, the trial court could reasonably conclude the prior offense evidence was equally or less inflammatory than the charged offense because, in the prior crime, defendant struck the victim twice; however, in the charged offense, the victim fell out of her chair due to the force of the punch. The trial court could reasonably conclude that the fall out of the chair in the charged incident was more inflammatory than the double blow in the prior case.

Thus, the trial court could reasonably conclude the prior offense evidence had strong probative value due to the nearly identical aspects of the charged and uncharged offenses, and that the prior offense evidence was not particularly prejudicial. Accordingly, the trial court acted within its discretion by concluding, under the more stringent "interest of justice" analysis, that the probative value weighed heavily enough to admit the prior offense evidence.

Admission of prior acts of elder abuse does not violate due process so long as the trial court properly balanced the probative value against its prejudicial impact. (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 704.) As explained *ante*, the trial court's ruling is within the bounds of reason. Accordingly, we conclude defendant's due process

rights were not violated because the trial court properly balanced the probative value of the evidence against its potential prejudicial impact.

B.      EXCITED UTTERANCE

1.      *PROCEDURAL HISTORY*

Prior to trial, the prosecutor moved the trial court to find admissible the victim's initial statements to Moynihan. The prosecutor asserted the statements were admissible as excited utterances. (Evid. Code, § 1240.) The prosecutor asserted the victim remained scared and in pain in the days following defendant's abusive act; Moynihan was the first person to whom the victim spoke following the abuse, other than defendant, so the victim's statements qualified as excited utterances or spontaneous statements. (Evid. Code, § 1240.)

At the hearing, defense counsel explained he was reiterating an argument he had made in chambers, which was that the victim's statements did not qualify as excited utterances because (1) there was a three- or five-day gap between the abusive act and the victim speaking to Moynihan; and (2) there was evidence at the preliminary hearing reflecting the victim's pain did not begin until a couple of days after the abuse.

The prosecutor asserted there was evidence demonstrating the victim was in pain immediately following the abuse, in particular that the victim asked defendant to move her to the couch and asked for a pain reliever. The prosecutor further argued the victim was still under the stress of the abusive incident when the victim spoke with Moynihan, as evinced by the victim crying, not eating, and being in pain.

16

The trial court explained that the evidence reflected the victim was in pain as a result of the abuse, and therefore, the victim "continued to remain excited about that particular event." The trial court ruled the victim's statements to Moynihan were admissible as spontaneous statements. (Evid. Code, § 1240.)

### 2. *ANALYSIS*

Defendant contends the trial court erred by finding admissible the victim's initial statements to Moynihan. In particular, defendant asserts the statements were not admissible as excited utterances because the victim was no longer excited when she spoke to Moynihan.

A hearsay statement will be admissible if it "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) Our Supreme Court has explained, that "although the lapse of time between the underlying event and the statement describing it is relevant, a statement remains spontaneous "'if it nevertheless appears that [the statement was] made under the stress of excitement and while the reflective powers were still in abeyance." [Citation.]' [Citation.] The amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 810.)

"The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v.*

*Gutierrez, supra*, 45 Cal.4th at p. 811.) In making its determination, the trial court should consider: "the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication." (*People v. Merriman* (2014) 60 Cal.4th 1, 64.)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*People v. Merriman*, *supra*, 60 Cal.4th at p. 65.)

As to the passage of time, three to five days passed between the victim being struck and the victim speaking to Moynihan. The victim provided an explanation about defendant striking her after Moynihan saw bruises on the victim and asked "what happened." Accordingly, the victim made the statements in response to a general question. The victim was not subjected to intensive questioning.

When the victim spoke to Moynihan, the victim appeared "[v]ery upset, very shaken, and in a lot of pain." The victim appeared to be in pain because "her voice was very shaky. And she also told [Moynihan] that she was in a lot of pain." It also appeared to Moynihan that the victim was not wearing her dentures. The victim spoke

to Moynihan on Friday, and said she was punched the prior Sunday. The victim said she had only eaten soup since Sunday. The victim suffered a fractured jaw and fractured sinuses; she had bruising on her neck, chin, and sternum; her jaw was swollen; and she was slightly dehydrated. The foregoing evidence reflects the victim was still emotional, and that her physical condition was poor.

In the statements to Moynihan, the victim blamed defendant for her physical and emotional state. Upon speaking to Spainhoward, and learning defendant might be held criminally responsible for his actions, the victim denied anything adverse had occurred. Thus, given the evidence, it appears the victim had time for reflection upon speaking to Spainhoward, because she wanted to protect her child (defendant); however, at the time the victim spoke to Moynihan, the content of the victim's statement did not suggest she had reflected on perhaps fabricating a version of events.

Given the evidence that the victim was emotionally upset, in physical pain, and changed the content of her story upon learning charges could be filed against her son, the trial court acted reasonably by concluding the victim was still in an excited state of mind when she spoke to Moynihan. Since there is support for the trial court's finding that the victim's statements to Moynihan were made under the stress of excitement caused by being punched, we conclude the trial court did not err.

Defendant contends there is nothing reflecting the victim was prevented from using the telephone or otherwise contacting people after being struck. Defendant further asserts defendant left for Texas days before the victim contact Moynihan. Defendant asserts that given the victim did not seek help earlier, there is nothing to

support the conclusion that the victim was still upset or excited when she spoke to Moynihan. As explained *ante*, we apply the substantial evidence standard to the trial court's findings of fact. (*People v. Merriman*, *supra*, 60 Cal.4th at p. 65.) While there might be support for contrary findings, we do not reconcile such contradictions. Our authority begins and ends with determining whether there is support for the trial court's findings. Accordingly, we find defendant's argument to be unpersuasive, because, as explained *ante*, there is support for the trial court's findings of fact. (*People v. Peterson* (2012) 211 Cal.App.4th 1072, 1085.)

### C.    PRIOR INCONSISTENT STATEMENTS

#### 1.    *PROCEDURAL HISTORY*

Prior to trial, the prosecutor submitted motions in limine in which the prosecutor asserted the victim, during trial, may feign memory loss, and if she did so, then the victim's out-of-court statements should be admissible as prior inconsistent statements. The prosecutor's assertion regarding the victim's possible conduct was based upon the victim denying any injury and assault at the preliminary hearing. The prosecutor sought to have the victim's statements to Moynihan, hospital personnel, and adult protective services employee Dhaliwal admitted as prior inconsistent statements, if the victim feigned memory loss.

Defendant asserted the prosecution should be precluded from introducing the victim's out-of-court statements as prior consistent or inconsistent statements until the prosecutor satisfied the statutory requirements for such evidence. At the hearing on the motion in limine, the trial court explained that it would need to reserve ruling on the

20

motion until it heard the victim's testimony. However, the court said its tentative ruling was to admit the evidence for impeachment purposes.

During trial, the prosecutor asked if the victim recalled her jaw hurting. The victim responded, "I have no idea when my jaw was injured. I saw nothing. I felt nothing. There's nothing there. I got up and I fainted, and they took me to the hospital. That's all I know about it." The victim said she fell outside her house, while she was alone. When she awoke, she was in a field, and then she was taken to the hospital.

The prosecutor questioned the victim about waking in the field. The victim said she was having difficulty hearing the prosecutor's questions. The prosecutor asked "Can you hear me now?" and "Does this help?" at which point the victim responded, "Nothing. Nothing happened." The prosecutor asked to approach the bench. Outside the presence of the jury, the prosecutor requested permission to treat the victim as a hostile witness due to the victim being uncooperative. Defense counsel asserted the victim was tired. The trial court decided to recess for lunch so the victim could rest.

After the lunch break, the following exchange occurred:

Prosecutor: "Do you remember being in the hospital because of pain in your jaw?

"[The victim:] Pain? I think—I wasn't awake much. And I don't recall pain. They kept me sedated quite well.

"[Prosecutor:] Do you remember going to the hospital, at some point, because of your jaw?

"[The victim:] Because of what?

21

"[Prosecutor:]  Because of your jaw injury?

"[The victim:]  I didn't understand the last words, I'm sorry.

"[Prosecutor:]  Do you remember going to the hospital because your jaw hurt?

"[The victim:]  No, I don't recall it hurt.

"[Prosecutor:]  Why were you in the hospital?

"[The victim:]  I went and I picked up in a field there, that the parking lot to the hospital was [*sic*].

"[Prosecutor:]  So now you're saying that you were in a field near the parking lot of the hospital?

"[The victim:]  I don't know.

"[Prosecutor:]  Is that what you're saying?

"[The victim:]  That's what I'm saying.  Possibly, that's it.  I—I'm at a really big loss on things like this because I don't have memory anymore.  It's about that long.

"[Prosecutor:]  So you believe your memory is about an inch long; is that what you're saying right now?  And you're shaking your head yes; correct?

"[The victim:]  Yes.

"[Prosecutor:]  And you're saying that you now remember that you were in a field next to the hospital[?]

"[The victim:]  I was not against it.  It made no difference to me.  I could not keep my head up and look around and what have you.  It just wasn't my cup of tea.  And I did not—there was nothing for me to check out or do or whatever.

22

"[Prosecutor:] [Victim], you understand the importance of telling the truth today; right?

"[The victim:] I don't know. I don't know anything.

"[Prosecutor:] You don't know that it's important to tell the truth?

"[The victim:] Some I do and some I don't, yes.

"[Prosecutor:] Could you please repeat that[?]

"[The victim:] Pardon?

"[Prosecutor:] Please repeat that. Say it again.

"[The victim:] I don't know what you said now. It comes and goes, I'm sorry.

"[Prosecutor:] What comes and goes?

"[The victim:] My thoughts or things that I see, things that I hear. It—it's just—it's something I'd rather not have, let me put it that way.

"[Prosecutor:] Do you remember telling us this morning that you were here—the reason why you were here was so that you could prove that your son did no wrong? Do you remember saying that?

"[The victim:] No.

"[Prosecutor:] So you did not say that this morning[?]

"[The victim:] No, ma'am.

"[Prosecutor:] So why are you here today, [victim]?

"[The victim:] I don't have any idea what—what I do here [*sic*]."

The prosecutor proceeded to show the victim a photograph of the victim. The victim said she did not know who the person was in the photograph. At sidebar, defense

23

counsel asked if there was a competency issue. The prosecutor asked the trial court to determine if the victim was "claiming a lack of memory," so the prosecutor could "impeach with prior inconsistent statements." Defense counsel asserted the issue should be addressed after hearing medical personnel testify about the victim's memory deficits. The trial court said, "[I]t is clear from her answers that she's not able to recall what, if anything, she said in the past. At least, consistently, she's indicated that she doesn't remember . . . ." The trial court explained that it could not determine if the victim was feigning her lack of recollection without hearing medical testimony. The trial court said it would permit the prosecutor to ask the victim leading questions.

The prosecutor asked the trial court to find the victim was feigning memory loss. The prosecutor asserted medical testimony was not needed to make such a determination because the victim's responses reflected she was uncooperative and using memory loss as a "ruse so that she doesn't have to answer these questions." The trial court explained there is a difference between memory loss and a lack of cooperation. The trial court again said it could not determine if the victim was feigning memory loss until it heard medical testimony. The trial court declared the victim to be a hostile witness.

The prosecutor asked to clarify if she properly understood that (1) the trial court was not ruling on whether the victim was feigning memory loss; but (2) the trial court declared the victim to be a hostile witness; so (3) the prosecutor could approach the victim as a hostile witness; and therefore (4) ask the victim leading questions; and then

24

(5) if the victim said she did not recall, then impeach her with prior inconsistent statements. The trial court responded, "Yes."

Defense counsel asserted that if the victim said she did not recall, then the prior inconsistent statement law would not apply. The prosecutor asserted the trial court needed to rule on whether the victim was feigning memory loss. The trial court explained that it believed questions about prior inconsistent statements should be asked after medical personnel testified about the victim's possible memory deficits. The prosecutor explained she would then have to wait for defense counsel to present medical testimony. The trial court said that if the victim testified she did not recall speaking to a particular person, then the court was "prepared to make a ruling that there's going to be a prior inconsistent statement." Defense counsel again asserted memory loss did not create an inconsistent statement. The trial court again said it would be helpful to have medical testimony on the issue.

The prosecutor resumed questioning the victim, and the following exchange occurred:

Prosecutor: "Do you remember talking to your neighbor Lanette Moynihan on October 28th, 2011?

"[The victim:] I beg your pardon?

"[Prosecutor:] Do you remember talking to your neighbor Lanette Moynihan on October 28th, 2011?

"[The victim:] I don't know who that is. Who—

25

"[Prosecutor:] I can't understand what you're saying. Can you speak a little bit closer to the microphone?

"[The victim:] I said I can't understand quite who you are referring to.

"[Prosecutor:] Do you have a neighbor named Lanette?

"[The victim:] A label?

"[Prosecutor:] A neighbor.

"[The victim:] A neighbor?

"[Prosecutor:] Yes.

"[The victim:] I have quite a few of them.

"[Prosecutor:] Do you have one neighbor named Lanette?

"[The victim:] Named what?

"[Prosecutor:] Lanette.

"[The victim:] Lana?

"[Prosecutor:] Lanette.

"[The victim:] Lanette?

"[Prosecutor:] Moynihan.

"[The victim:] Lanette Moyn—no, I don't recall that name.

"[Prosecutor:] She's married to Darren?

"[The victim:] I'm sorry?

"[Prosecutor:] She's married to Darren?

"[The victim:] I don't know.

26

"[Prosecutor:] Did you call her on October 28th? Did you call Lanette on October 28th, 2011?

"[The victim:] I have no idea in the world.

"[Prosecutor:] Did you—did you tell her to come over and were you crying when you called her that morning?

"[The victim:] I don't know what—

"[Prosecutor:] When Lanette saw you at your house after you called her, do you—did she ask you what happened to your face?

"[The victim:] I don't know.

"[Prosecutor:] Did you then tell her that your son [defendant] had punched you?

"[The victim:] I don't know what you're asking for.

"[Prosecutor:] Did you tell your neighbor Lanette that your son [defendant] punched you in the face?

"[The victim:] Pinch?

"[Prosecutor:] Punched you.

"[The victim:] I'm sorry, I'm having a loss.

"[Prosecutor:] So did you tell her that, or no?

"[The victim:] Not that I know of.

"[Prosecutor:] Did you tell Lanette that you were in pain and you had not eaten for three days?

"[The victim:] I don't remember.

"[Prosecutor:] Did you tell her that?

27

"[The victim:]  Not to my knowledge.

"[Prosecutor:]  Did you tell Lanette that you and [defendant] had an argument at a table in your house, and he punched you in your face?

"[The victim:]  No.  Somebody's got a—no.

"[Prosecutor:]  Did you then tell Lanette that you fell to the floor and [defendant] picked you up?

"[The victim:]  I don't have any idea—

"[Prosecutor:]  Did you tell—

"[The victim:]  —what you're talking about.

"[Prosecutor:]  Did you tell Lanette that?

"[The victim:]  Not to my knowledge.

"[Prosecutor:]  Did you then tell Lanette that [defendant] took care of you and he made soup for you?

"[The victim:]  Who?

"[Prosecutor:]  That [defendant] took care of you and made soup for you?

"[The victim:]  He done that since I've been there.

"[Prosecutor:]  I'm sorry.

"[The victim:]  He's done that so many times that—that the house—he would make dinner, anything.

"[Prosecutor:]  But—

"[The victim:]  He did that.  I—

28

"[Prosecutor:]  Did you tell Lanette that [defendant] made soup for you and took care of you after he punched you?

"[The victim:]  I have no idea what—I can't tell you something I don't know.

"[Prosecutor:]  Did you tell Lanette that [defendant] had left that morning to buy a car in Texas, and that's when you called her?

"[The victim:]  He—run that by me one more time, please.

"[Prosecutor:]  Did you tell Lanette that [defendant] had left to buy a car in Texas that day, and that's when you called her?

"[The victim:]  I don't—I don't know where you got that.

"[Prosecutor:]  Did you tell her that?

"[The victim:]  I did not."

As the questioning continued, the victim said she did not tell the triage nurse, Pratt, that she had been unable to eat, and she denied telling the triage nurse that her pain was "as bad as it can be."  The victim denied telling Dr. Foster that she suffered a direct blow to the side of her face, and denied telling him that her son struck her.  The victim also denied telling Profit, the social worker, that her son struck her, and denied telling Profit that she called Moynihan after defendant left the house.

> 2.      *ANALYSIS*

Defendant contends the trial court erred by allowing the prosecutor to question the victim about the victim's prior inconsistent statements.

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is

29

offered in compliance with [Evidence Code] Section 770." (Evid. Code, § 1235.)

Evidence Code section 770 requires that, prior to an inconsistent statement being admitted, the witness be given an opportunity to explain or deny the statement, or that the witness be subject to being recalled as a witness. "'The "fundamental requirement" of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony.' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) We review the trial court's ruling for an abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 956.)

The victim testified that she fell outside her house, while she was alone. When she awoke, she was in a field, and then she was taken to the hospital. The victim's testimony contradicted her out-of-court statements that defendant punched her. The victim told several people out-of-court that defendant punched her, such as Moynihan, emergency room nurse Min, and Dr. Foster. Thus, the victim's in-court testimony was directly contradicted by her out-of-court statements: in-court, the victim said she was injured by falling when she was alone; out-of-court, the victim said she was injured when she was punched by defendant. The victim's out-of-court statements were inconsistent with her trial testimony, and therefore, the trial court acted within the bounds of reason by permitting the victim's prior inconsistent statements to be introduced.

D.      PROSECUTORIAL MISCONDUCT

    1.     *PROCEDURAL HISTORY*

During the victim's testimony, the court recessed for a 15-minute break. When the victim resumed her testimony after the break, the following exchange occurred:

Prosecutor: "And were you actually in the witness room with your son [defendant] during the break?

"[The victim:] Yes.

"[Prosecutor:] And were you talking about your testimony this morning?

"[The victim:] I beg your pardon?

"[Prosecutor:] Were you talking about with [defendant] what you were testifying about today?

"[The victim:] There's no—I don't know what you meant.

"[Prosecutor:] Well, you said that you came here to help your son. Were you talking to him about what you're talking about in front of the jury?

"[The victim:] Oh, no. I wasn't talking to him. I was talking to my other son who was listening to my conversation in the room.

"[Prosecutor:] So you're saying that your other son Tom Smith was in the back room also?

"[The victim:] For about two minutes.

"[Prosecutor:] But the defendant was also with you, correct? [Defendant] was also with you in the back room?

"[The victim:] He was there when I got there."

Danek was the victim's primary care physician for approximately eight years. The prosecutor asked if Danek was able to speak freely with the victim during appointments. Danek said that speaking with the victim was "a little bit difficult" due to overbearing family members. When asked specifically, Danek said defendant was the family member to whom she was referring.

Patterson-Macho was a physician's assistant at the Neural Center. She said defendant was "the primary historian at all visits. He, basically, ran the office visit encounter." Patterson-Macho explained that the victim "deferred most of the answers" to defendant. The victim "frequently would look at [defendant] as if . . . she was asking permission to answer the question." Patterson-Macho also recalled defendant "continually interrupt[ing]" the victim.

Tom is the victim's son and defendant's brother. When the prosecutor was questioning Tom, Tom said he had been sitting with the victim during the trial. The prosecutor asked if defendant visited with Tom during the breaks in the trial. Defense counsel objected on the basis of relevance, and the trial court and parties stepped into the hallway, outside the presence of the jury. The prosecutor argued the evidence would be relevant to showing Tom's bias. The trial court overruled defense counsel's objection. The following exchange occurred when questioning resumed:

Prosecutor: "[T]he defendant in this case comes to visit you at every break, correct?

"[Tom]: Not every break, no.

"[Prosecutor:] But he does come to visit you during the breaks?

"[Tom]:  Sometimes.

"[Prosecutor:]  And when you're there talking to him, your mother is also present, correct?

"[Tom]:  Yes.

"[Prosecutor:]  And sometimes when you're sitting out in the hallway and the jurors are in the hallway, the defendant comes over to talk to the both of you then as well, correct?

"[Tom]:  He has.

"[Prosecutor:]  You bring your mother to court every day, correct?

"[Tom]:  Yes.

"[Prosecutor:]  Why do you do that?

"[Tom]:  Because I can't leave her alone at home."

During closing argument, the prosecutor said Danek's testimony reflected "defendant is pretty dominating, that he likes to run the show when it comes to his mother, that when she's seeking medical help or being seen by her doctors, that she really doesn't get to get in a word much."  The prosecutor said Patterson-Macho's testimony reflected defendant "was the primary historian, and that even when she [Patterson-Macho] asked [the victim] questions, [the victim] would look over at [defendant] as if to ask whether it was okay to speak."

The prosecutor's argument continued:  "We also know that this defendant is manipulative because he goes and speaks to his mother and his brother during the breaks and in the hallway in front of you during the breaks.  And he makes sure that his

33

mother comes in to court every day." Defense counsel objected "to that last statement," on the ground of improper argument because it was not based upon the evidence. The trial court noted the objection and reminded the jury that the attorneys' arguments were not evidence.

### 2. *ANALYSIS*

Defendant contends the prosecutor committed misconduct by asking the jury to make findings and conclusions "on things they saw outside of the courtroom." The People contend defendant forfeited most of this issue by objecting only to one statement in the prosecutor's closing argument. We choose to address the merits of defendant's contention because he objected.

"'"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Tully* (2012) 54 Cal.4th 952, 1009-1010.) A prosecutor may not argue matters not in evidence. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 839.)

Tom's trial testimony reflected that sometimes when he and the victim were sitting in the hallway, and the jurors were also in the hallway, the defendant came over and spoke with Tom and the victim. During closing argument, the prosecutor argued,

34

"We also know that this defendant is manipulative because he goes and speaks to his mother and his brother during the breaks and in the hallway in front of you during the breaks." The fact that defendant spoke to Tom and the victim during breaks in trial was part of the trial evidence due to Tom's testimony. Thus, the prosecutor was not asking the jury to take note of their personal experiences in the hallway; the prosecutor was arguing the evidence presented during the trial.

The prosecutor's assertion that the evidence showed defendant was manipulative was an interpretation of the evidence supported by Danek's and Patterson-Macho's testimonies regarding defendant's behavior with the victim—his domineering and controlling mannerisms. Additionally, that same evidence of defendant's domineering and controlling tendencies supports the prosecutor's argument that defendant ensured the victim came to court every day. In particular, Patterson-Macho explained the victim, during her appointments, "frequently would look at [defendant] as if . . . she was asking permission to answer the question." One could reasonably infer that if the victim's verbal responses were controlled by defendant, then her decision as to whether or not to attend defendant's trial was also controlled by defendant. Given that the prosecutor argued the evidence presented during trial, we conclude she did not commit misconduct.

E.    SENTENCING

1.    *PROCEDURAL HISTORY*

Defendant filed a *Romero*[4] motion, in which he requested the trial court strike his prior strike conviction.  Defendant asserted his prior conviction concerned conduct that occurred in 1988.  After that conviction, he completed probation without violations and became the primary caretaker for the victim.

Tom wrote a letter in support of defendant.  Tom explained that he and his siblings "had a very tumultuous upbringing at the hands of [their] father who ruled with a very big and hard iron fist."  Tom asserted defendant was the victim's primary caregiver, he took good care of the victim, and that the victim missed defendant.  Shelby Smith, defendant's niece and the victim's granddaughter, also wrote a letter in support of defendant.  Shelby explained that defendant was the victim's primary caregiver and that the family relied on defendant to "ground" the victim when "her mind dazes off."

Sioux, the victim's former daughter-in-law, also wrote a letter in support of defendant.  Sioux explained the victim's health had rapidly declined since defendant was incarcerated following the verdict.  Sioux wrote that the victim missed defendant and was unable to communicate with him due to being unable to hear on the telephone.  Additionally, Sioux expressed concern that the victim would lose her home if defendant were incarcerated for a lengthy period of time.

---

[4] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

36

Three other letters were submitted also asserting defendant was the victim's primary caregiver and that he took good care of her. Additionally, defendant wrote a letter to the court. In the letter, defendant discussed the physical and sexual abuse inflicted on him by his father. Defendant asserted his father was ultimately jailed for raping defendant's sister. Prior to sentencing, Tom addressed the trial court on behalf of the victim, who was no longer able to speak clearly. Tom explained that the victim felt defendant should not be sentenced to prison because defendant had spent nearly 30 years caring for her.

Tom also testified, for purposes of the *Romero* motion. Tom explained that defendant had helped family members financially over the years, including the victim. Tom said defendant had the support of defendant's girlfriend as well as friends and family who would "get him back on track" upon his release from incarceration.

The trial court said it considered defendant's motion, the prosecution's opposition, Tom's testimony at the hearing, the trial testimony, and the probation officer's report. The trial court cited the rule from section 1385, which permits the trial court to dismiss a prior strike allegation in the interest of justice. The trial court also cited *Romero* and *Williams*.[5] The trial court explained the standard from the *Williams* case—whether a defendant should be deemed to be outside the spirit of the "Three Strikes" law due to the nature and circumstances of the present and prior convictions,

---

[5] *People v. Williams* (1998) 17 Cal.4th 148.

37

and the particulars of the defendant's background, character, and prospects. (*People v. Williams*, *supra*, 17 Cal.4th at p. 160.)

The trial court found defendant's current conviction was serious. The court explained the crime was willful, caused the victim to suffer great bodily injury, the victim was elderly, and the victim was defendant's mother. The trial court found defendant's prior strike was also "very serious." The trial court noted the prior conviction date was June 1989 for the offenses of (1) unlawful sexual intercourse (§ 261.5), and (2) a lewd or lascivious act upon a child under the age of 14 years (§ 288, subd. (a).) The victim in the prior case was also defendant's relative.

The trial court explained that if defendant "had lived a crime-free life" between the 1989 conviction and the current conviction, then the court "might have a different feeling." The court noted that between the convictions, defendant had "a misdemeanor conviction in 1998 for driving under the influence, another misdemeanor conviction in 2009 for driving under the influence, [and] another conviction in 2010 for driving on a suspended license." The trial court then cited defendant's November 2000 convictions for threatening and abusing the victim (§§ 422, 368, subd. (b)(1)), which the court found to be a serious and violent felony. The trial court also noted that defendant had a pending case for failing to register as a sexual offender (§ 290).

The trial court found defendant failed to take responsibility for his actions. The court cited defendant's letter as an example, explaining that defendant did not take responsibility for harming the victim in his letter. The trial court concluded defendant's criminal record contradicted Tom's testimony describing defendant as "a person of

38

character." The court found defendant harmed the victim in 2011, after already having been convicted of harming her in 2000. The court concluded defendant failed to learn from his past offenses, and therefore, his prospects for learning from the current offense were "fairly dismal." As a result, the trial court concluded defendant did not fall outside the spirit of the Three Strikes law. The trial court denied defendant's *Romero* motion.

When sentencing defendant, the trial court selected the upper term. The trial court gave multiple reasons for selecting the upper term. First, the court found the crime involved great bodily harm, disclosing a high degree of cruelty, in particular, the 78-year-old victim's fractured jaw. (Cal. Rules of Court, rule 4.421(a)(1).) The court noted there was a substantial size difference between defendant and the victim— defendant is six feet tall and approximately 210 pounds, while the victim is approximately five feet two inches tall and less than 130 pounds. Further, the court found defendant, as the victim's caregiver, was aware of the victim's frailties, and despite the victim's injury, he did not take her to a doctor, and instead left the state.

Second, the court found the victim was particularly vulnerable. (Cal. Rules of Court, rule 4.421(a)(3).) The court explained the victim relied on defendant for her care, and there was evidence that she was emotionally and physically vulnerable, such as the evidence reflecting the office on aging had been talking with the victim about providing her services. Third, the court found defendant took advantage of a position of trust or confidence to commit the offense. (Cal. Rules of Court, rule 4.421(a)(11).) The court found defendant was in a position of trust as the victim's primary caretaker because the victim relied upon him and trusted him "a great deal."

39

Fourth, the court found defendant engaged in violent conduct indicating he was a serious danger to society. (Cal. Rules of Court, rule 4.421(b)(1).) The court explained that this was defendant's second conviction for abusing the victim, and that he had a prior conviction for sexually abusing his niece. Fifth, the court found defendant's convictions were numerous and of increasing seriousness. (Cal. Rules of Court, rule 4.421(b)(2).) The trial court referred to the prior elder abuse and sexual abuse convictions to support this finding. In regard to mitigation, the trial court concluded "there are no factors in mitigation."

## 2. *ANALYSIS*

Defendant contends the trial court erred by denying his *Romero* motion and sentencing him to the upper term.

### a) *Romero* Motion

Defendant asserts the trial court erred by not granting his *Romero* motion because the 18-year prison term is essentially a sentence of life without parole because defendant was 58 years old at the time of sentencing.

When deciding whether to strike a defendant's prior strike conviction, "'the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part . . . .'" (*People v. Garcia* (1999) 20 Cal.4th 490, 503.) Notably, the length of a defendant's prison term is not among the list of factors for a court to consider.

Nevertheless, some courts, when considering whether to dismiss a strike, have considered a defendant's age and the length of the potential sentence, in conjunction with defendant's prospects. However, the fact that a defendant is middle aged, when "considered alone, does not remove a defendant from the spirit of the Three Strikes law. Otherwise, those criminals with the longest criminal records over the longest period of time would have a built-in argument that the very factor that takes them within the spirit of the Three Strikes law—a lengthy criminal career—has the inevitable consequence—middle age—that takes them outside the law's spirit." (*People v. Strong* (2001) 87 Cal.App.4th 328, 345.) Thus, age and length of sentence cannot, by themselves, justify the dismissal of a strike.

Defendant also contends the trial court failed to consider that "even a devoted child can once every ten years lose his or her temper." Defendant cites the stress of being a primary caregiver as the reason for his loss of temper. Defendant's reasoning is problematic because it supports the trial court's finding that defendant failed to learn from his past offenses, and therefore, his prospects for learning from the current offense were "fairly dismal," in that defendant's argument can be interpreted as asserting defendant will lose his temper again when the victim is approximately 88 years old and more vulnerable.

The trial court gave a well-reasoned explanation as to why it chose to not dismiss defendant's prior strike. Defendant's argument on appeal does not persuade us that the trial court's reasoning was incorrect. The fact that defendant, if he were to serve his full term, could be 76 years old upon his release is not sufficient in itself to show the trial

41

court acted outside the bounds of reason. (See *People v. Garcia*, *supra*, 20 Cal.4th at p. 503 [decision is reviewed for an abuse of discretion].)

b) <u>Upper Term</u>

Defendant contends the trial court erred by imposing the upper prison term. Defendant contends the evidence reflects he was caring for the victim without support from other family members, and caring for her was "increasingly onerous and frustrating." Defendant asserts the trial court erred by not "tak[ing] into consideration the physical and psychological toll" of being a primary caregiver. Although unclear, we infer defendant is relying on the mitigating factor that he was suffering from a mental condition that significantly reduced his culpability for the crime. (Cal. Rules of Court, rule 4.423(b)(2).)

We apply the abuse of discretion standard of review. (*People v. Delgado* (2013) 214 Cal.App.4th 914, 919.) When a court sentences a defendant, it may select the upper, middle, or lower term. (Cal. Rules of Court, rule 4.420(a).) In exercising its discretion to select one of the three terms, the court "may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision." (Cal. Rules of Court, rule 4.420(b).)

The trial court gave a thoughtful explanation of its reasons for selecting the upper term. The trial court cited five aggravating factors that justified its decision to impose the upper term. The trial court, because it sat through the trial, was aware of defendant's role as the victim's caretaker. The victim testified that defendant cared for her and helped her. Thus, the trial court, in selecting the upper term, was aware that

42

defendant served as a caretaker, but still found the five aggravating factors supported the imposition of the upper term. Given that the trial court was aware of defendant's caretaker position, that it gave a reasoned analysis for selecting the upper term, and its reasons are supported by the record, such as defendant having a history of violence with the same victim, we conclude the trial court did not err. The court's decision fell within the bounds of reason.

### F. CUMULATIVE ERROR

Defendant contends the cumulative effect of the foregoing alleged errors rendered his trial fundamentally unfair. As explained *ante*, we have found no errors. Accordingly, there is nothing to cumulate. Therefore, we conclude defendant's trial was not rendered unfair due to the effect of cumulative errors. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1225 [no errors means nothing to cumulate].)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

43